UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re:

MARY C. ADDAMS                                              Chapter 13
d/b/a EMERALD CITY SYSTEMS,
                                                            Case No.: 8-15-75191-AST
                    Debtor.
------------------------------------------------------------------X

# MEMORANDUM OPINION TO
# DISMISS CHAPTER 13 CASE

Pending before the Court is a motion filed by Michael and Jamie Shapiro (the "Shapiros"), seeking to dismiss Debtor's, Mary C. Addams, chapter 13 case (the "Motion to Dismiss"). The Shapiros hold a second mortgage lien against Debtor's two-family property used as her primary residence, and claim Debtor cannot confirm a feasible plan. During the course of proceedings on the Motion to Dismiss, Debtor filed papers requesting this Court determine the use and value of her residence and bifurcate the Shapiros' claim arising from their second mortgage into secured and unsecured portions (the "Valuation Request"). While the parties acknowledge that the value of the property exceeds the balance owed on Debtor's first mortgage lien, and that the amount owed on the Shapiros' second mortgage lien exceeds the remaining value of the property, Debtor asserts she can bifurcate the Shapiros' claim on the basis of her residence being a two-family home from which she derives rental income, and that by bifurcating she can confirm a feasible plan. Debtor also acknowledges that she cannot confirm her plan if she is unable to bifurcate the Shapiros' claim.

Thus, the primary issue is whether Debtor may invoke 11 U.S.C. §§ 506, 1322, and 1325 to value the residence and bifurcate the Shapiros' claim into secured and unsecured portions, or whether bifurcation is prohibited by § 1322(b)(2), which provides that a chapter 13 plan may not

1

modify the rights of a holder of a claim secured only by a security interest in real property that is the debtor's principal residence.[1] The secondary issue, if bifurcation is possible, is the precise value of the property, as the valuation would bear on the amount of the Shapiros' secured claim and feasibility of the plan.

Because the Court has determined that pursuant to the Bankruptcy Code, bifurcation is prohibited under the facts here, and as Debtor's plan is therefore not confirmable, valuation is irrelevant, and the Motion to Dismiss should be granted.

## Jurisdiction

This court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and 1334(b), and the Standing Orders of Reference in effect in the Eastern District of New York dated August 28, 1986, and as amended on December 5, 2012, but made effective *nunc pro tunc* as of June 23, 2011.

## Findings of Fact and Conclusions of Law

This decision constitutes the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## Factual Background and Procedural History[2]

### The Bankruptcy Petition

On November 30, 2015, Debtor filed for relief under chapter 13 under the Bankruptcy Code. In her Schedules, she listed her primary residence as 225 Thompson Shore Road, Manhasset, New York (the "Thompson Property"), encumbered by a first mortgage owed to Chase

---

[1] Unless otherwise stated, all statutory references are to title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

[2] The factual background and procedural history are taken from the pleadings, exhibits and other papers submitted by the parties and the public docket in this case.

Mortgage in the amount of $531,000, and the Shapiros' second mortgage in the amount of $435,000. Debtor initially listed the value of the Thompson Property at $825,000, but later revised the value downward to $787,000. *See* Schedules A, D and Amended Schedule A. [dkt items 1, 17] In her Amended Schedule A, Debtor identified the Thompson Property as a "Duplex or multi-unit building." *See* Amended Schedule A. [dkt item 17]

**The Shapiros' Relationship with Debtor**

While the parties have peripheral disagreements as to the history of their relationship and course of dealing, the relevant aspects are not in material dispute. Prior to the commencement of this case, the Shapiros were friends of Debtor, and during the course of that friendship, Debtor borrowed money from the Shapiros to help her buy the Thompson Property. Because she had school-aged children and was in the midst of a divorce, Debtor desired to purchase the Thompson Property in order to remain in her children's school district. Debtor was also attracted to the Thompson Property because it was a two-family home, and she believed she could make mortgage payments by renting out a portion of the house; however, she could not qualify for a conventional mortgage to pay the $850,000 purchase price. Thus, the Shapiros loaned Debtor $265,000 to help her with the purchase (the "Loan"); this Loan was evidenced by a promissory note dated April 7, 2006 (the "Note"), and was secured by a second lien mortgage of the same date (the "Mortgage"). The Note provided the Loan was due within six months or upon the sale of the Thompson Property; the priority of these events was not specified in the Note. The five-page Mortgage provides: "This real property is or will be improved by a one or two family residence or dwelling only," and contains a boiler-plate assignment of "rents, issue and profits" as "further security" for payment of the Note.

Debtor defaulted on the Loan. The Shapiros commenced a foreclosure action against her in New York Supreme Court, Nassau County, on August 10, 2010, which resulted in the Shapiros obtaining a Judgment of Foreclosure and Sale on August 6, 2015 in the sum of $436,365, plus interest, attorneys' fees, costs and other disbursements. The foreclosure sale of the Thompson Property was scheduled for December 1, 2015, and Debtor filed this case on the eve of that sale.

**Debtor's Proposed Chapter 13 Plans**

On December 29, 2015, Debtor filed her initial chapter 13 plan (the "Plan"). [dkt item 14] The Plan provided, *inter alia*, that the Shapiros' claim would be valued and treated as a secured claim of $256,000 pursuant to § 506(a) with the balance of about $180,000 treated as an unsecured claim. Debtor further stated an intention to refinance and pay out the $256,000 in full settlement and satisfaction of the secured portion of the Shapiros' claim; the unsecured portion would receive pro rata treatment with other unsecured claims.

On March 2, 2016, the Chapter 13 Trustee filed a motion to dismiss Debtor's case (the "Trustee's Motion to Dismiss"). [dkt item 23] Among the reasons set forth in the Trustee's Motion to Dismiss was her contention that "the Debtor has not commenced and [sic] adversary proceeding or any other action to determine the extent of the lien held by Shapiro. Additionally, the Plan is speculative in nature in that, assuming the Debtor is successful in bifurcating the Shapiro mortgage, the Debtor will be able to obtain financing to satisfy the remaining secured portion as proposed in the Plan."

In an effort to address the Trustee's Motion to Dismiss, on March 11, 2016, Debtor filed an amended chapter 13 plan (the "Amended Plan"), along with additional documents. [dkt items 24, 26, 28] The Amended Plan provided, *inter alia*, that the Shapiros' claim would be "modified and valued" and treated as a secured claim of $259,000 pursuant to §§ 506(a) and 1322(b)(2) with

4

the balance of about $177,000 treated as an unsecured claim.  Debtor further stated an intention to refinance and pay out the $259,000 in full settlement and satisfaction of the secured portion of the Shapiros' claim, and again pay the unsecured portion pro rata.

**Motion to Dismiss and Valuation Request**

On March 21, 2016, the Shapiros filed their Motion to Dismiss, including a memorandum of law in support, and an affidavit from Michael Shapiro. [dkt item 30]  Debtor filed affirmations from herself and from her counsel in opposition to the Motion to Dismiss, which included Debtor's Valuation Request. [dkt items 32, 33]  In reply, the Shapiros filed an affirmation from their counsel and a memorandum of law in further support of the Motion to Dismiss. [dkt items 37, 38]

On July 14, 2016, the Court held a hearing on the Motion to Dismiss, as well on the Trustee's Motion to Dismiss.  At that hearing, the Court heard further from the parties on the issues presented in the pleadings, namely, issues regarding plan feasibility and valuation.  The Shapiros stated they believe the Thompson Property to be worth $815,000.

The Court adjourned the hearing on the Trustee's Motion to Dismiss and the Shapiros' Motion to Dismiss and instructed Debtor to file documents evidencing her source of financing for the Amended Plan, and advised the parties that if Debtor could demonstrate access to plan funding, the Court would then conduct a hearing to address the Valuation Request and § 1322(b)(2) issues.

On July 28, 2016, Debtor filed her Second Amended Chapter 13 Plan (the "Second Amended Plan"),[3] which provides, *inter alia*, that the Shapiros' claim would be "stripped down" and treated as a secured claim of $259,000 pursuant to §§ 506(a) and 1322(b)(2) with the balance of about $177,000 treated as an unsecured claim paid pro rata with other unsecured claims. [dkt item 41]  Additionally, the Second Amended Plan provides Debtor will refinance the second

---

[3] Debtor incorrectly filed the Second Amended Plan titled as the Third Amended Plan.

5

mortgage held by the Shapiros for approximately $259,000.00 with a loan from a third party, which upon confirmation would be paid to the Shapiros in full satisfaction of the secured portion of their claim. Debtor also filed a Letter of Intent and Escrow Deposit dated July 27, 2016 to evidence the source of financing for the Second Amended Plan. [dkt item 42]

**Scheduling Order**

On August 5, 2016, having been satisfied that Debtor demonstrated access to plan funding for a hypothetical secured portion of the Shapiros' claim, the Court entered a Contested Matter Scheduling Order (the "Scheduling Order"), establishing an evidentiary hearing and deadlines for prehearing submissions on dismissal of the case, valuation of the Thompson Property, and treatment of the Shapiros' claim under the Bankruptcy Code (the "Hearing").[4]  [dkt item 44]

On September 2, 2016, the Court so-ordered a stipulation between the parties admitting into evidence each side's home inspection report relating to the Thompson Property and waiving cross-examination at the Hearing as to the facts, observations, and opinions set forth in the other side's inspector's report. [dkt item 55]

On September 29, 2016, the Court conducted the Hearing, admitted the prehearing submissions, including Mr. Shapiro's affidavit, heard testimony from the parties' respective appraisers and also from Debtor, and allowed the parties to submit posthearing briefs, which they did. [dkt items 58, 60, 63]

---

[4] Both sides submitted direct testimony affidavits in accordance with the Scheduling Order. Debtor submitted two direct testimony affidavits: (1) Neil B. Schmelkin, an engineer; and (2) Sharon Treanor, a real estate appraiser. [dkt items 46, 47] The Shapiros submitted three direct testimony affidavits: (1) Richard B. Klimkowski, Jr., a real estate appraiser; (2) David E. Weissman, an attorney practicing in real estate law, contracts of sale and closings; and (3) Michael Shapiro (the "Shapiro Aff."). [dkt items 49, 50, 51]

**Discussion**

**Section 1322(b)(2)**

Section 1322 governs the contents of a chapter 13 plan, and provides in pertinent part:

> (b) Subject to subsections (a) and (c) of this section, the plan may—
>
> ….
>
> (2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence*, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]

11 U.S.C. § 1322(b)(2) (emphasis added).

Debtor essentially asserts that she may bifurcate the Shapiros' secured claim because the Note is secured both by a lien on the income-producing two-family Thompson Property and by the assignment of rents generated by any persons residing in the second family portion of the residence. The Shapiros oppose any such proposed modification and argue that the anti-modification provision of § 1322(b)(2) is applicable. The parties' disagreement requires a statutory construction analysis informed by applicable case law.

This Court's analysis necessarily begins by looking to the language of the statute itself to determine if the statute is plain or ambiguous. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012); *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004); *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989); *see also In re Miller*, 462 B.R. 421, 429 (Bankr. E.D.N.Y. 2011). "[I]n determining plainness or ambiguity, courts are directed to look 'to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *In re Phillips*, 485 B.R. 53, 56 (Bankr. E.D.N.Y. 2012) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "Courts are required to apply the plain meaning of a statute, unless the statute is ambiguous or applying the unambiguous plain meaning would yield

7

an absurd result." *Id.* If the statutory language is clear, a court's analysis must end there. *Hartford Underwriters Ins. Co. v. Union Planters Bank, Nat'l Ass'n*, 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.").

First, the parties agree that § 1322(b)(2) allows Debtor to modify the Shapiros' rights as the holder of a secured claim unless the Shapiros' claim is secured only by a lien against Debtor's principal residence. As this Court has noted previously, "[t]his proscription, which has come to be known as the anti-modification provision of the Bankruptcy Code, gave rise to substantial litigation over the extent to which § 1322(b)(2) applies." *In re Miller*, 462 B.R. 421, 426 (Bankr. E.D.N.Y. 2011); *see Nobelman v. American Savings Bank*, 508 U.S. 324, 325-26, 332 (1993) (chapter 13 debtor cannot strip down a partially unsecured residential mortgage lien secured only by the debtor's principal residence).

Second, Congress expressly defined "debtor's principal residence" in the Bankruptcy Code to mean, among other things, "a residential structure if used as the principal residence by the debtor, including incidental property, without regard to whether that structure is attached to real property."[5] 11 U.S.C. § 101(13A)(A). The term "incidental property" means "with respect to a debtor's principal residence—(A) property commonly conveyed with a principal residence in the area where the real property is located; (B) all easements, rights, appurtenances, fixtures, rents, royalties, mineral rights, oil or gas rights or profits, water rights, escrow funds, or insurance proceeds; and (C) all replacements or additions." 11 U.S.C. § 101(27B).

---

[5] A "debtor's principal residence" is also defined in the Bankruptcy Code to include "an individual condominium or cooperative unit, a mobile or manufacture home, or trailer if used as the principal residence by the debtor." 11 U.S.C. § 101(13A)(B).

There is no dispute that the Thompson Property is where Debtor principally resides and did reside as a result of the Loan, and that at all relevant times the parties intended Debtor to use the residence as a two-family home and generate rental income from a portion of the property. *See, e.g.,* Debtor's Affirmation in Opposition to Motion to Dismiss, at ¶¶ 10-11 [dkt item 32]; Shapiro Aff., at ¶¶ 5-6. The question is whether the Shapiros' claim is "secured only by a security interest in real property that is the debtor's principal residence," which appears to be an issue of first impression in this District, but has resulted in various conclusions by many courts, including a court in this Circuit, which observed, "[d]ozens of courts have wrestled with the issue of whether 11 U.S.C. § 1322(b)(2) prohibits strip-down of a secured claim on a debtor's principal residence, if the real property also hosts commercial activities—whether they be a tailor shop, a trucking business, or a multi-unit home with apartments to let." *In re Brooks*, 550 B.R. 19, 23 (Bankr. W.D.N.Y. 2016) (noting that even within the Western District of New York there have been "three distinct and opposing approaches" to the issue). The three approaches to the construction to be given to § 1322(b)(2) and specifically the meaning of the word "only" are as follows.

### 1.     Bright-Line Approach: So Long As Principal Residence

Several courts have adopted a so-called bright-line approach based on whether the real property includes the debtor's principal residence, and hold that the anti-modification provision of § 1322(b)(2) applies so long as the debtor principally resides at the subject real property, even if the real property has other purposes. *See In re Macaluso*, 254 B.R. 799 (Bankr. W.D.N.Y. 2000) (describing this bright-line approach as a minority but emerging view); *Brooks*, 550 B.R. at 25. In *Macaluso,* the debtor proposed a chapter 13 plan that called for the strip-down of a mortgage that encumbered a multi-use parcel of real property, which contained a tailor shop and two residential apartments, one of which the debtor lived in. The debtor argued that § 1322(b)(2) only prohibits

9

the modification of a mortgage on real property that a debtor uses exclusively as a principal residence, and as the subject real property was not used exclusively as a principal residence, the debtor was not prohibited from modifying the mortgage.

The court focused on the language of § 1322(b)(2) and found "[t]he key factor in interpreting section 1322(b)(2) is placement of the word 'only'" and determined that "only" modifies "secured" and nothing else. As explained by the court:

> Notably, the statute does not limit its application to property that is used *only* as a principal residence, but refers generally to any parcel of real property that the debtor uses for that purpose. So long as the only collateral is a single parcel of real estate, it matters not that that parcel may fulfill many uses or be divided into many units. The statutory requirements are fulfilled whenever the debtor principally resides in that real estate or some part thereof.

*Macaluso*, 254 B.R. at 800 (emphasis in original).

The *Brooks* court also noted that a majority of courts have rejected the notion that a mortgagee being granted a security interest in rents derived from a debtor's principal residence removes the mortgagee from the protections of the anti-modification clause of § 1322(b)(2). *Brooks*, 550 B.R. at 25 (citing *In re Mayer-Myers*, 345 B.R. 127, 130 (Bankr. D. Vt. 2006)). The *Brooks* court specifically noted that Section 9-109(d)(11) of the New York Uniform Commercial Code ("UCC"), as the Vermont UCC, excludes from the scope of personal property the "creation or transfer of an interest in or lien on real property, including a lease or rents thereunder", treating those as secured transactions instead. *See* N.Y. U.C.C. Law § 9-109(d)(11). On that basis, both *Brooks* and *Mayer-Myers* treat assignment of rents and leases in a residential mortgage as "but an additional aspect of the security interest in the land and not as additional, distinct piece of collateral." *Brooks*, 550 B.R. at 26.

Other courts have expressed concern that this bright-line approach places too much emphasis on whether the property includes the debtor's principal residence without regard to the other uses, which might in fact be the predominant purpose of the property. *See, e.g., In re Zaldivar*, 441 B.R. 389, 390 (Bankr. S.D. Fla. 2011) ("The problem with the *Macaluso* approach is that it could conceivably be applied to, for example, a large factory in which a debtor maintains a small apartment as his or her principal residence. This result would be the tail wagging the dog."); *see also In re Laycock*, 497 B.R. 396, 400 (Bankr. S.D.N.Y. 2013).

### 2. Bright-Line Approach: Principal Residence Only

Another bright-line approach, which has been adopted by two U.S. Courts of Appeals, is that "the anti-modification provision of § 1322(b)(2) does not bar modification of a secured claim on a multi-unit property in which one unit is the debtor's principal residence and the security interest extends to other income-producing units." *Lomas Mortgage, Inc. v. Louis*, 82 F.3d 1, 7 (1st Cir. 1996). In following *Lomas*, the Third Circuit later focused on the word "is" in the phrase "real property that is the debtor's principal residence" and reached a similar conclusion. *Scarborough v. Chase Manhattan Mortg. Corp. (In re Scarborough)*, 461 F.3d 406, 411, 413-14 (3d Cir. 2006). The Third Circuit noted, "Congress equated the terms 'real property' and 'principal residence'" and stated that for the anti-modification provision to apply the real property securing the mortgage must be only the debtor's principal residence. *Id*. Therefore, "a creditor does not receive anti-modification protection for a claim secured by real property that includes both the debtor's principal residence and other rental property that is not the debtor's principal residence." *Id.* at 411. "Where a creditor takes an interest in real property that is not the debtor's principal residence, such as property that will be used as income-generating rental property, the anti-modification provision does not apply." *Id*. at 414.

11

Judge Brown of the Bankruptcy Court for the District of Vermont followed this approach in *In re Galaske*, No. 11-10891, 2011 WL 5598356 (Bankr. D. Vt. Nov. 16, 2011) ("If the real property is not being used solely as the debtor's principal residence at the time of the mortgage transaction, the anti-modification provision of § 1322(b)(2) is inapplicable."). However, in *Galaske*, the collateral at issue consisted of the debtor's residence and an automotive business, and, as such, when the mortgage at issue was granted, the property had both a residential and a commercial usage. *Id.* at *2.

This approach, too, has drawn criticism because "it would permit security interests to be modified on a debtor's primary residence when the debtor decides to rent out a garage apartment or convert a basement into a rentable apartment." *Zaldivar*, 441 B.R. at 390; *see also In re Laycock*, 497 B.R. at 400.

### 3.     Case-By-Case Approach: Parties' Intentions

Yet another approach is to go case-by-case and avoid any bright-line test. *See, e.g., Brunson v. Wendover Funding, Inc. (In re Brunson)*, 201 B.R. 351 (Bankr. W.D.N.Y. 1996); *see also Brooks*, 550 B.R. at 23 (listing cases). This approach takes into consideration the totality of circumstances and states "each case must turn upon the intention of the parties: Was home-ownership the predominant intention (and rental income simply a means to that end) or was investment income or the operation of a business the predominant purpose of the transaction?" *Brunson*, 201 B.R. at 353. The *Brunson* court elaborated further and explained:

> The Court must focus on the predominant character of the transaction, and what the lender bargained to be within the scope of its lien. If the transaction was predominantly viewed by the parties as a loan transaction to provide the borrower with a residence, then the antimodification provision will apply. If, on the other hand, the transaction was viewed by the parties as predominantly a commercial loan transaction, then stripdown will be available.

*Id*. at 354. The *Brunson* court concluded that this approach is consistent with Congress' intent behind § 1322(b)(2) and with the Supreme Court's decision in *Nobelman*. *Id*.

The case-by-case approach has also been met with criticism. The *Scarborough* court opined that "the multi-factor test introduces uncertainty and unpredictability to residential mortgage transactions because it requires courts to engage in subjective, hindsight analysis as to the intent of the parties." *Scarborough*, 461 F.3d at 414; *see also In re Laycock*, 497 B.R. at 401.

**This Court Adopts a Bright-Line, Statutory Construction Approach**

To this Court, in the context of the facts here, addressing a single structure that has multi-family features, the proper construction of the anti-modification clause of § 1322(b)(2) should strictly adhere to the meaning ascribed the term "debtor's principal residence" in the Bankruptcy Code. The anti-modification language is not ambiguous, and Congress expressly defined "debtor's principal residence" to include "a residential structure if used as the principal residence by the debtor, including incidental property," and defined "incidental property" to include "property commonly conveyed with a principal residence in the area where the real property is located," as well as easements and rights appurtenant thereto, including "rents, royalties, mineral rights, oil or gas rights or profits, water rights, escrow funds, or insurance proceeds." 11 U.S.C. §§ 101(13A)(A), 101(27B).

Thus, Congress defined the debtor's principal residence to include rents derived from the real property, and, as such, a security interest in rents is part of the security interest in the principal residence. Therefore, the fact that Debtor had a right to rent out a portion of the Thompson Property and the Shapiros had a security in such rentals does not change the conclusion that the Shapiros' claim is a claim secured only by a security interest in real property that is Debtor's principal residence, and that § 1322(b)(2) prohibits Debtor from bifurcating the Shapiros' claim

into secured and unsecured portions. In addition, as noted above, under New York law, a security interest in rents is considered an interest in real property, not personal property. N.Y. U.C.C. Law § 9-109(d)(11).

Further, to avoid the types of uncertainty potentially introduced by uses made by a debtor after the loan at issue closes as expressed in *Zaldivar*, 441 B.R. at 390 and *Laycock*, 497 B.R. at 400, the transaction should be measured by looking at the agreement as entered into and how the parties agreed and intended the property would be used upon the closing of the mortgage loan. Here, there is no dispute between the parties that when the Loan was made they each anticipated the Thompson Property would be Debtor's principal residence, that she would rent a portion out, and that the rental income generated thereby was intended to further secure the Note.

**Valuation of the Thompson Property is Irrelevant**

Having determined that the Shapiros' claim cannot be bifurcated into secured and unsecured portions under § 1322(b)(2), the Court need not and will not decide the fair market value of the Thompson Property.

**Dismissal**

This case has been pending since November 30, 2015, an exceptionally long time for a chapter 13 case to pend without a confirmed plan. Because Debtor has been unable to file a plan that complies with §§ 1322 and 1325, this case should be dismissed for cause under § 1307(c)(1) for unreasonable delay by the debtor that is prejudicial to creditors. *See In re Merhi*, 518 B.R. 705, 719 (Bankr. E.D.N.Y. 2014) (finding debtor's inability to propose a viable plan to be an unreasonable delay that is prejudicial to creditors and thus warranted dismissal of the case); *In re Palazzolo*, 55 B.R. 17, 17-18 (Bankr. E.D.N.Y. 1985) (dismissing case because debtor failed to propose a plan that complied with the Bankruptcy Code by not providing for the full payment of

14

a past due mortgage); *see also In re Lin*, 499 B.R. 430, 437 (Bankr. S.D.N.Y. 2013) (finding cause to dismiss for unreasonable delay because debtor's plan did not provide for payment of the priority tax debt in full, and was therefore, not feasible and nonconfirmable).

For the reasons stated above, this case will be dismissed; a separate order consistent herewith will issue.



**Dated: March 9, 2017**
**Central Islip, New York**

_____
**Alan S. Trust**
**United States Bankruptcy Judge**